Technically, it's still morning, so good morning, Your Honors. May it please the Court, David Cadieu for Costco, reserving five minutes for rebuttal. I'd like to focus on two main arguments today against class certification. One has to do with the lack of injunctive standing and the related lack of injunctive predominance. The second has to do with the lack of statistics, in this case, to support commonality. Either point defeats class certification. As to injunctive standing, where review is de novo, this Court recently issued two decisions of interest. One is the Bates v. UPS en banc decision at the end of December 2007. The other is the revised Dukes panel decision, which was issued in early December 2007. Bates tells us that with respect to standing, you take the snapshot at the time of certification. And Duke says that in an employment case that a plaintiff must be currently employed at the time of the lawsuit to have injunctive standing. The only plaintiff in this case to pass those hurdles would be Elaine Sasaki, but her standing is very precarious. First of all, she has no personal interest in promotions to assistant manager. That's because she's been an assistant manager for the last 12 years. The only job she's interested in is general manager. And the second point is that she should not even be in this class because her only reason for being here is that she wants to be a general manager. It is undisputed in this record that Costco promotes from within, which means here that assistant managers become general managers. It's also undisputed that with respect to promoting assistant managers to general managers, Costco has always promoted women at the same rate as men. So Sasaki should not even be in the class. Why is she in the class? That's because the judge made two mistakes. First, the district court misread Dr. Drogan's statistical report to conclude that there was a statistical disparity in promotion to general manager. And that's a mistake that the plaintiffs admit. That's in footnote nine of their brief. And the other mistake she made was to rely on the benchmarking of Dr. Bendick, which was wrong for two independent reasons. First, Dr. Bendick was comparing female representation in stores such as Nordstrom's with female representation at Costco. The Costco general manager runs a business that's $130 million in revenue a year. Hundreds of employees. The general manager makes over $110,000 a year plus stock options. To compare that kind of job involving that kind of skill and responsibility with the Nordstrom's department manager was just absurd. And there's no scientific basis for allowing that kind of benchmarking to occur. But beyond that, even if it were valid otherwise, external benchmarking, this court has told us in the Page case, external benchmarking is inappropriate in an internal promotion case. There was no justification to go outside and look for external benchmarks when we already had the data for Costco promotions in-house. Now the plaintiffs tried to rehabilitate the inclusion of people like Elaine Sasaki with an argument that the pool of assistant managers has been artificially depressed by under promotion into that position. That's an argument the district court didn't make, but that's one that the plaintiffs have offered here. But that argument goes nowhere because if you're going to artificially enhance the pool of assistant managers, well then to be fair, you also artificially enhance the promotion of those female assistant managers to general manager. And that's because the record tells us that at all times, Costco has promoted women to general manager at the same rate as men. Well, and if in fact, let's just premise that a given employer does differentiate or discriminate against women so that only a superstar can make it to the equivalent of an AGM position. Does it really tell you anything, does it demonstrate that the company is not discriminating if those superstar women who make it to an AGM position pass on to a general manager position in equal proportions to a body of men that include non-superstars? I mean, let me put it more broadly. It seems to me if you've got an attack against a company saying it discriminates against women, is it really necessary to look at each and every step in the company's hierarchy as a separate, in effect, a separate class? Well, or a separate subclass, and yes, it does make sense because these processes, this internal, this promotion from within process involves people getting years of experience at the prior levels. If there is a problem, and we contend there isn't, but if there is a problem that the unrefined statistics tell us, it's with respect to promotion to assistant general manager. Once you become an assistant general manager, the data shows there is no, quote, unquote, problem. Except that the data shows that perhaps, let's accept that premise, that the data shows that women are promoted to general manager positions from AGM at the same proportion, same rate that men are. But your women's pool may be stronger because to make it to that level, you may have to be a superstar. But there's no evidence in this record that the women are stronger who are promoted to assistant general manager. You're suggesting that that's an affirmative obligation. I'm not sure that it is. If, in fact, you can demonstrate prejudice in promotion to the assistant general manager level, it's not a big jump to conclude those women that did make it that far must have superior credentials. And yet those superior credentials don't seem to reflect any superior promotion rate to general manager. I mean, we're all operating in theory here, but I'm not sure that it's quite the case that promotion rates need to be examined or must be examined at each individual step. If, in fact, there's something wrong going on down below, the fact that promotions up above are at equal rates, I don't know that that demonstrates anything. Well, I take your point, Your Honor. I'd like to move beyond the standing to a related issue, which is injunctive predominance, which relates to lack of standing. This case in the Duke's revised panel decision, this court in the Duke's revised panel decision adopted a minimum test for injunctive standing. It asked, would reasonable plaintiffs without the possibility of money be bringing this case simply for injunctive relief? And reasonable, of course, implies you look at all the objective circumstances, not just at the subjective declaration of a plaintiff. So in this case, we have two of the three plaintiffs lacking injunctive standing. We have all plaintiffs seeking all possible damages, not just punitive damages, but also emotional distress damages, which is something that was not involved in the Duke's case. And they seek it according to proof, they say in their complaint. And the only plaintiff who does have arguable standing, and that would be Ms. Sasaki, has no personal interest at this point in assistant manager promotions, as we've discussed. And we can intuit that three quarters of this class would be people seeking assistant manager positions. Because the record tells us that three times as many promotions have occurred with respect to assistant manager as have occurred with respect to general manager, which makes sense because there's approximately two to three assistant managers for every general manager. So- That winds up bringing us back to a sort of similar question, which is why should we treat promotion to AGM and promotion to GM so differently? Because there are different sets of decision makers involved, because there are different criteria involved in the two positions. To be an assistant manager, you need to have certain experience. The job analysis for assistant manager, for example, says merchandise manager preferred. There's statements in the court below that there are no written criteria for promotion, which is simply untrue. One is what I just mentioned. Everyone agrees in this case, both plaintiffs and defendants, that if you have merchandise experience as a manager, your chances are going to be much, much better. You have about a one in seven chance of being promoted to assistant general manager. If you don't have the merchandise manager experience, your chances may be one in 100. Everyone agrees that merchandise manager experience is a prerequisite for promotion. But when you go from assistant manager to general manager, what you need there is experience as an assistant manager. So you have, I mean, Your Honor, to your point about why can't we just expand the class as far as we want to, as long as we show that there is so-called under promotion, at some point, where does that end? Why doesn't the class include the regional vice president or the senior vice president? Well, for one thing, because the class certification didn't seek that inclusion. Your premise appears to be that you have to treat each step separately. That's the starting point. I'm not sure that's true. Now, there may be good reasons, and you started to give specific reasons with regard to these promotions. But you can have, take the U.S. Army. There must be 20 different grades. If there is inherent prejudice in the Army, you wouldn't expect it to apply only to the level between first lieutenant and captain. You could make a case that, look, if this is inherent within the organization, you shouldn't look at each step all by itself. Now, in the process of developing evidence, you'd need to. But your starting point seems to be, well, Ms. Sasaki is an assistant general manager, so she can't represent people who are aspiring to that position. And if the allegation against the company is a more structural inherent one, I'm not so sure why she can't. Well, Judge Clifton, let me try to approach it this way. The so-called employment practice being challenged here is one of discretionary decision making, what the plaintiffs would call subjective decision making. The Supreme Court in Watson, and this court in the Duke's decision, has made clear that there is nothing inherently wrong with such a system. There's nothing unlawful about it. It becomes unlawful or potentially unlawful only when you have a disparate impact. And it doesn't make sense, to me anyway, to focus on promotion to general manager when all the data tells us that at that point there is no impact. The people involved in this decision making, these poor men who are unsupervised by some kind of bureaucratic process that would prevent them from indulging in stereotypical thinking, apparently that problem doesn't exist at that level. The only arguable level it exists at is the level below. And that's why, that's where the commonality is in our view. But let me, let me. Counsel, and I'm going to move you on a little bit. I can suggest that what you're arguing about here might have some validity, but I also understand my colleague's argument. Aren't you really just making then a typicality argument rather than a standing argument, since Suzaki certainly is an employee. She certainly is an employee who was promoted to assistant general manager. Then she's going to general manager. She's in the general class of that class which wants to be promoted. And we have an injunction situation which you've already, you've already talked to us about. But aren't we really just making a typicality argument that she isn't a typical class member and she has the standing, but we're really talking about typicality? Judge Smith, we are talking about typicality in part, but the focus of my argument here with respect to the lack of injunctive standing goes directly into the lack of predominant, the predominant, under B-2 is the plaintiff's burden to show that injunctive relief is predominant. And they can't do that when most of the class lacks standing with respect to injunctive relief. Well, the Duke's amended opinion basically seems to wave goodbye to people that aren't current employees. That's true, Your Honor. And Bates, I think, arguably goes even further and suggests you need to be, you need to be employed at the time of certification. But in any event, I'd like to move on to my second argument, which is the lack of commonality. Now, the Duke's case is relevant here. Footnote 2 of the revised Duke's case says that courts not only may but must address Rule 23 facts even if they also implicate the merits. Duke's, in several places, goes away from a previously lax standard to say things such as expert evidence must be properly analyzed, must be scientifically reliable, must be probative based on well-established scientific principles. The court below did not have the advantage of that guidance. The court, the decision of the court below is filled with language such as the court must accept allegations of the complaint as true. The court must rely on expert opinion so long as they are not fatally flawed. And the court dismisses the defendant's arguments when they go to the weight as opposed to admissibility. And a critical, a critical way in which that sort of analysis or lack of analysis led the court astray was with respect to the Rothman work plan in 2001. At that time, Costco instituted a number of promotional reforms, which contrary to the managers and general managers, and they're set forth in our brief. But in summary, Costco was explicitly, overtly, proudly exploiting, not exploiting, but proclaiming diversity as a goal for the company. And as a goal that's put in the performance evaluations, that's heralded in the company documents. There's a career development section of the performance appraisal plans. And the statistics tell the story, the proof is in the pudding. Because before 2002, when Rothman went into effect, Judge Clifton, the statistics you're talking about, if you go back to 99 and drag in all that data, you have five standard deviations of difference between actual and expected outcomes for assistant manager promotions. But if you look at just the statutory data, which happens to coincide with the advent of the Rothman plan, according to Dr. Saad, who's the only expert who examined that data, there is no statistically significant disparity. But the judge below refused to look at that, because the judge said, well, this is a disputed fact, therefore, I'm not going to resolve it. That is a misapplication of Rule 23 principles. At a minimum, the judge should have had made a finding on that. And we would contend any finding other than that the Rothman work plan changed promotion practices would have been clearly erroneous. This court said in the Page case that pre-statutory data should not be included within a statistical analysis unless employment practices have remained unchanged. But here, employment practices clearly did change, and they changed at just about the time of the class period beginning. And there was, beyond all that, there was a clearly erroneous finding that the judge made on the separate issue of commonality, which has to do with the nationwide versus regional aspect of the class that was certified. The court first found that, what is in fact the truth, which is that assistant general managers are promoted at the regional level. Later, there's a throwaway sentence in which the court says corporate officials are involved in promotions generally. And from there, the judge went to suggest that somehow AGM promotions, assistant manager promotions, are implicated centrally, but they're not. The record is very clear on that, that when you promote an assistant manager, the general manager will be involved, maybe the regional vice president will be involved, maybe the senior regional vice president might be informed, but there's no one above them that even knows about the promotion, that's even consulted about it. It's undisputed on the record that these promotions occur regionally. And why is that important? Because, again, their theory is, the plaintiff's theory is, that you have these unsupervised managers making these decisions. And that itself is the evil. Well, if that's the case, then if you're going to look for commonality, you should look for commonality where the decision is made. And the evidence here shows that Costco has eight regions. Only two of the eight regions show statistical disparity, arguably three, depending, and there is a debate between statisticians on that. But now, counsel, aren't you really just arguing to us that the court really applied the wrong standard? And so these other arguments about what is or is not on the record, we should, following Dukes, we should send back to the district court and have them look at it again. Isn't that what we have to do? That certainly is an option, Your Honor. Well, isn't that what Dukes says we need to do? Well, Dukes, I think, Your Honor, you're referring to the remand in Dukes on the issue of who was employed and who wasn't employed at the time of the lawsuit. And that's, so obviously this court, like Dukes, could remand the matter. Our modest suggestion to you is that on the facts we're adducing here, there is no, there's no finding other than the finding that we're suggesting would be appropriate. Well, if we're really doing this on 23A factors, and we're remanding, and we're looking at the 23A factors that I think Dukes was also looking at, it seems to me that Dukes says to us we need to remand. Your Honor, I'm not, I'm not, I'm not clear what you're talking about, other than the one, the one point with respect to, in Dukes, as to, as to who was employed at the time. There's one final issue of statistical commonality. And that is, About 30 seconds left. Do you want to save any of it? You don't want to sit down. Oh, then, I thought, I thought this was my pre-rebuttal time, didn't I? No, that, that's the total time. All right. State your question. Good morning, Your Honor. Good morning. Jocelyn Larkin for the Plaintiffs and the Appellees. In this case, the district court certified a class of approximately 700 women who, who challenged Costco's practices for promotion into its assistant general manager and general manager position. This is not a large case. This is a very narrowly focused case. It challenges one practice, which is promotion for only two job positions under one Federal statute, Title VII. This Court reviews the class certification order in this case under the highly deferential abuse of discretion standard. It's not the role of this Court to reweigh the evidence. It's not the role of this Court to decide the effect of the Rothman work plan or whether corporate officers are involved or not. In this case, the district court made very detailed factual findings. Well, let's, let's, let's get to it. I mean, when somebody starts telling me how highly deferential it is, I start to think you don't want us to look at it. So let's look at it. Let's look. What findings are there of anything but the fact that, well, there is evidence from plaintiffs to support a proposition? I mean, I went through the order very carefully, and I got the sense that not that the judge was actually finding, you know, there are issues in common. Rather, I get the sense the judge is saying, well, there's evidence supporting the proposition there are issues in common, which isn't quite the same thing. Well, I think it's important for us to step back and say and recognize that the question here is not have we proved the particular liability facts. The question is have we identified common questions of law or fact that satisfy the commonality requirement of Rule 23. And so it is our burden as plaintiffs to come forward with that evidence and satisfy the court that we have presented a legitimate question. And let me, Judge Clifton, give you some examples of the facts that she did find. She determined, and these are at the excerpts of Record 1000, that there were no written selection criteria for promotion to AGM and GM. There was no formal notification or application for these positions of any kind. She determined that there were statistics compelling evidence of gender disparities sufficient to demonstrate class-wide impact. Stop right there. Okay. Because I'm not sure she really did find that. I mean, I read this, and it goes back and forth, but when she talks about earlier on that page comparing Dr. Drogan's analysis and Dr. Saad's analysis, she says, however, Dr. Saad's analysis has presented an alternative approach but has not discredited Dr. Drogan's results or methods. When I hear that, it's almost a Dalbert test in terms of, well, can the evidence get in? Is it scientific and so forth? The answer, she says, is yes. But I don't see anything there that says that Dr. Drogan's results are persuasive, sufficient to demonstrate that these people, this group, this purported class, is really being dealt with in common as opposed to a collection of individuals who happen to be female. In fact, she does make that finding here. The plaintiffs, this is at page 1,000, plaintiffs have presented compelling evidence of gender disparities at this time sufficient to demonstrate class-wide impact. So that was looking at Dr. Drogan and Dr. Bendick both, and then also taking into account carefully what were the concerns that were raised by Dr. Saad. So she evaluated all that evidence. She was presented with Dalbert challenges on a motion to strike, which she analyzed. But she also took into account each of these separate arguments in terms of looking at what was the persuasiveness of the evidence. And she found, made the finding, that there was compelling evidence of gender disparities. Well, again, it may be a matter of language, but what you just read followed immediately what I just read. And it says, are strong enough to establish commonality without making it real clear what that constitutes. I mean, I have a hard time, frankly. I look at the statistical evidence here, and it's a struggle for those of us who aren't full-time statisticians. But this isn't the world's most overwhelming case of disparate impact. And I go through here and try to figure out, well, compelling evidence of gender disparity is sufficient to demonstrate class-wide impact. I can, in an inclusory fashion, take that to be, well, maybe she made that conclusion by the standard I've articulated, I think should be applied. But it follows discussion that seems to say, well, this approach is sufficiently scientific to be admitted. They've presented evidence, but I don't see anything that says, and I've concluded, that evidence supports the proposition of X. So what she finds is that it, I think there's an earlier place where she discusses that it raises an inference of discrimination. And let me see if I can find that. The statistical evidence that was presented was quite compelling. Dr. Drogen concluded that for the period 1999 to 2005 you have to deal with other issues there, too, because the class period doesn't go back to 99. If you take out those first few years, it's a lot harder to find the case. Well, I think that it's important, though, to take into account that there isn't one and only one legal way to present statistics in a discrimination case. That, I think, is the purpose of it. If you're trying to make a case that's based essentially on statistics, because I certainly haven't seen cited to me anything that demonstrates independent proof of intentional discrimination or purposeful discrimination by Costco against women, this case seems to be based on statistics. And you go through the standard deviations, your numbers aren't that big. If you cut it down to the time period that's covered by the class, the numbers don't appear to be big enough. Well, in this case, our statistician was used that earlier data because there was an effort to make sure that we were looking at a real pattern. And he wanted to ensure that there were sample sizes that were large enough in order to see that pattern. And the case law in the Ninth Circuit is very clear that that information prior to the charge filing period is relevant in terms of making that analysis But you do have a problem. If 1999 to 2002 shows a number that's, or 2004 shows a nice number for your purposes, but 2002 when the class period starts, 2004 doesn't, the inference that, well, if discrimination happened before, it probably continued can be just as equally matched by an argument that says, well, behavior changed, something happened. So there's not discrimination during the class period. Costco's expert actually did find that there were statistically significant disparities in both the year 2003 and also cumulatively. And that's at excerpts of record 1017. But Judge Clifton, let me actually step to another point that you've just raised, which is that this is essentially a case just about statistics. It very much is not. This is a case where we have substantial evidence concerning not only what these uniform policies are, but what the impact of those policies was. So, for example, we have anecdotal evidence from Elaine Sasaki and Ms. Ellis describing what the impact, bringing essentially the cold numbers to light, explaining what it was like when there was no posting and no criteria, and how they Well, see, but the lack of posting is not unlawful. The lack of criteria is not unlawful. The only question is, is that taken advantage of in such a way as to produce discrimination? So you can tell me, well, there's no posting. That doesn't tell me anything about whether there's discrimination. What is very, a very important piece of the evidence, though, that puts the puzzle together is Dr. Reskin's testimony about how stereotypes operate. And in circumstances where you do not have criteria and when you do not have posting, what happens is that it's much more likely that stereotypes will affect decision making. And you don't have let's take that from you don't have to have statistics to make a case. You can prove discrimination through direct evidence. Would you call her report direct evidence of discrimination by Costco? No, what doesn't speak to Costco at all? Yes, it does. Because she looked very closely at the specific practices that they have, and then other evidence about the culture of the company, which has the effect, essentially, of allowing these subjective decisions to be made in a particular way. And a very additional important piece of evidence are those focus group notes from Costco's own managers. So beginning in 2002, Costco brought its managers together to talk about their promotion practices. And they first conducted a series of focus groups, and then there was a report in 2002. And what Costco's own managers concluded was that inconsistencies in the promotion practices allow for favoritism and individual biases to enter into the process. Now, that's not my sociologist. That's Costco's own managers. At that point, that task force recommended that Costco adopt posting and selection criteria for the AGM and GM positions. The CEO of the company specifically vetoed those recommendations. So then what happens? Do things change? No. In 2005, there's a second set of focus groups. And again, Costco's own managers are brought together. They conduct discussions. And what do they find? They say that Costco's promotion practices are freighted with stereotyping, favoritism, a lack of understanding of the promotion process. People do not know what it takes to be promoted. Inconsistent criteria used for selection. So what you see here is a very consistent and unchanged pattern in terms of a process that Costco's own managers themselves acknowledge disadvantages women. So for example, they talk about the fact that in the merchandising manager position, there are continuing stereotypes about the ability of women to do those jobs because they're overseeing people who use forklifts. The CEO of the company, Mr. Sinigel, talks about those himself. He specifically talks about those stereotypes. Let me turn for a moment to the issue of the injunctive standing. Judge Clifton, I think you made the point earlier that it isn't necessary necessarily for there to be an employee at each step. And in fact, that what Judge Patel found following Hartman v. Duffy was that the practices that were being challenged here were the same with respect to both the AGM and the GM position, so that she had appropriate standing in order to obtain injunctive relief for the AGM position. But the decisions being made by the emphasis by Costco was that the decisions were made by different people. Well, Judge Patel made a finding to the contrary. And in fact, there was quite a bit of evidence about that. And I would specifically point you to not only her finding with respect to the policies being set at the corporate level, but also the fact that the corporate office directs that the lower level people prepare these promotable lists. And if you look at those at ER1, the excerpts of record at 130 through 141, and particularly the ones at 138 and 39, specifically they are looking at individuals who are potentially promotables from senior staff to AGM. Those names are being circulated at the very highest levels of the company. And once those people are put on those promotable lists, they're given certain advantages, more face time with the higher-ups often invited to meetings and the like. So clearly there's a process that's been set by corporate, and they continue to be involved because they have these sort of pre-selected superstars who are given additional contact. Let me follow up with one other point with respect to the point that you raised, Judge Clifton, about superstars. There is actually evidence in the record that women were more qualified as a group than men. I would direct you to Costco's own experts reported at the excerpts of record at 305. It shows that women as a group actually had higher performance ratings than did men. Let me address the question about Dukes and the standard with respect to how evidence is evaluated. The district court specifically recognized the opinion in the initial public offerings case, and she indicated that she understood that she was free to evaluate evidence that overlapped with the merits. In fact, she did so on a number of occasions. Let me also address the second point from Dukes. Well, she isn't just free, though. I mean, the point being made by the Dukes footnote identified by appellant is that he's not at liberty to but must consider the evidence. Did she do that? I believe that she did. I think there are, as I read to you earlier, a whole series of findings of facts that she did address. She made a specific finding of fact about the role of corporate officers, which is one of the facts that my opponent raises as something that wasn't resolved. I think the initial public offerings case makes an important point, though, which is that at the class certification stage, the district court needs to evaluate this evidence under rigorous analysis, but the court cannot let the proceedings essentially deteriorate into a whole mini-trial on the merits. And what you see in this case is, with this order, is the judge made a very thorough evaluation, but at certain points she did say that's a merits issue and I'm not going to get to that point. So I think she very definitely engaged in review of facts that overlap with the merits. When she engaged in the review on certifying the class under 23b-2, however, it seemed to me that she relied on three affidavits and didn't look at anything else. I mean, it's appropriate that if they're going to go under 23b-2, that this be primary relief and injunctive relief, and that there's even some cases that say money damages aren't even certifiable under 23b-2. So when I looked at this, and the only thing she said were the declarations of the plaintiff, I looked at what relief was requested. Request for back pay, request for compensatory damages, which was not in Dukes, request for punitive damages. Three of the plaintiffs who sit here wouldn't even need the injunctive relief. Excuse me, two of the three wouldn't even need injunctive relief. They're gone. And it seems to me a little bit unusual that one would say the class really did want injunctive relief. Judge Patel was following the decision in this Court in Molsky v. Gleick. What Molsky says is not that you look at the injunctive relief that one person or the named plaintiffs want, but you look at what is the purpose of the injunctive relief, what is the value of the injunctive relief, and what was the primary goal of the plaintiffs in bringing this case, and compare it with the monetary relief. Now, Judge Patel made a finding that those named plaintiffs were sincere in their declarations that injunctive relief was their primary interest. And I will note, Costco put in no evidence to contradict that. They took full-day depositions of these women. They did extremely thorough background documentary checks. They put in no evidence to dispute the fact that they were interested in injunctive relief. And I think importantly here is a letter that Elaine Sasaki wrote to the head of HR, and this is at the supplemental excerpts of record at 180 and 181, where two years before she ever contacted a lawyer, she's writing to the company and saying, I have an issue with a subjective application of standards, especially if there's an appearance of race or gender bias. She concludes her letter. She complains about the subjective process. She concludes by saying, I know this is going to ruffle some feathers, but I believe in Costco. I believe that our willingness to look at our flaws and address them makes us a better company. So two years earlier, she's writing to the company saying, we need to deal with this problem of inconsistency and subjectivity. That's very easy to say since she's the only one who's still employed. I mean, I'm really looking at what are we really looking for when we're here? We've got three plaintiffs. One is still an employee. The other two aren't. I'm looking at what do they really want? What did they ask for? What is it they're really after here? Compensatory, punitive damages, request for back pay. And now I'm to say this is an injunctive relief? Well, what Judge Patel found was that she analyzed the actual injunctive relief at issue and she looked very closely at it and found that it would make very far-reaching changes at Costco. That was her specific finding. So she not only looked to what the plaintiffs said, but also what the value was. And, Judge Smith, I want you to keep in mind also that we're looking at this class of people who are there. There are 700 women here who could benefit from this injunctive relief. I appreciate that there's a class and I appreciate that that's exactly what we're looking at. But when I look at an injunctive relief case and we're under 23b-2, and when I'm looking on standing to bring the case in the first place and I'm trying to figure out what it is we're really trying to get through here, I've got to look at the complaint. I've got to look at what they did. I just don't look at three affidavits, which are, you know, why wouldn't they say those affidavits if they want to go under 23b-2 when their lawyer said that's what they've got to go under? I mean, I've got to look at the whole case. And when you look at his argument on standing as well as this argument for 23b-2, that's why I've asked the question. Well, at the time the complaint was filed, Ms. Ellis was also employed there. And she, too, it was very important to her that changes be made at Costco. But the point that I did address earlier is that Ms. Sasaki does have standing to seek that injunctive relief for the class. And that's sufficient for the case to go forward, given that the Court has found that the other requirements of Rule 23 have been satisfied. My time is up. Thank you for the argument. Rebuttal. Thank you, Your Honor. I have five quick points on my 21 seconds. First, I think Judge Smith, you're absolutely right. If this case is certified as a B-2 class, what case could not be certified as a B-2 class? If all the plaintiffs have to do is say what they need to say in their declaration. Judge Clifton, on the superstar point, the record, Excerpt of Record 317, shows that both men and women are superstars when they get promoted to assistant general manager. Only one in seven gets promoted. Men and women get promoted at the same rate if they have merchandise manager experience. As to the data within the statutory period, counsel suggested that Dr. Drogan went beyond because there wasn't enough data within the statutory period. But Dr. Saad, and there's no dispute here, Dr. Saad said the data within the statutory period is sufficiently robust to support statistical analysis. So there was no excuse on that basis to look at pre-statutory data. With respect to Costco's expert, he did not find statistical significance within the statutory period. The only way plaintiffs argue for that is by ignoring Dr. Saad's decision to take leaves of absence into account. And the plaintiff did not make any argument to the district court that she accepted as to why that would be improper. And finally, on promotable lists, counsel suggests that the promotable lists suggest that somehow there's a centralized decision making here. The only thing about promotable lists that's relevant is that everyone has to make a promotable list, that's true. But no one tells them at headquarters who to put on the promotable list, how to use the promotable list, and to decide who ranks where on the promotable list. So a promotable list is completely consistent with the regional decision making, which we think is undisputed in the record. We thank you. We thank both counsel for their arguments in this complicated and interesting case. We are going to adjourn. The judges will be back within a minute or so to talk to the students. Others are welcome to stay, but as I say, we've already indicated we can't talk about the merits of the case, so there's really not much you're going to learn. But you're welcome anyway. It's a public building. We thank everybody for the argument, and we are in recess. All rise. All right, let's get you both out. This court, for this session, stands adjourned. Thank you.
judges: Gould, Clifton, Smith